**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JASON MCCORMICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-CV-290-SNLJ** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

The Commissioner of the Social Security Administration denied plaintiff Jason

McCormick's application for Disability Insurance Benefits under Title II of the Social

Security Act. Coleman now seeks judicial review (#15). The Commissioner opposes the

motion (#22), and the issue is ripe. The Commissioner's decision is supported by

substantial evidence on the record as a whole and is affirmed.

**I.      Procedural History**

McCormick's application was denied at the initial determination level. He then

appeared before an Administrative Law Judge ("ALJ"). The ALJ found that McCormick

is not disabled because he can perform work that exists in substantial numbers in the

national economy. McCormick now appeals that decision.

**II.      Disability Determination—Five Steps**

A disability is defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has

lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 404.1520(a)(1); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered

disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the claimant's ability to perform his or her past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). The claimant is responsible for providing evidence relating to his RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(a)(3). If the claimant retains the RFC to perform past relevant work, he or she is not disabled. *Id.* § 404.1520(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden to show that the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n.5 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. §

404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. § 404.1520a. The Commissioner "first evaluate[s] [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If the Commissioner finds the claimant has a medically determinable mental impairment, the Commissioner "rate[s] the degree of functional limitation resulting from the impairment[.]" *Id.* § 404.1520a(b)(2). Next, the Commissioner determines the severity of the impairment based on those ratings. *Id.* § 404.1520a(d). If the impairment is severe, the Commissioner determines if it meets or equals a listed mental disorder. *Id.* § 404.1520a(d)(2). If the impairment is severe and does not meet or equal a listed mental disorder, the Commissioner prepares an RFC assessment. *Id.* § 404.1520a(d)(3).

## III.    The ALJ's Decision

At Step One, the ALJ found that McCormick met the insured status requirements through December 31, 2017, and had not engaged in substantial gainful activity since April 24, 2012. At Step Two, the ALJ found that McCormick suffers from three severe physical impairments—degenerative disc disease, osteoarthritis, and pancreatitis—and two severe mental impairments—anxiety disorder and depression. At Step Three, the ALJ concluded McCormick does not have an impairment or combination of impairments

4

that meets or equals one of the presumptively disabling impairments listed in the regulations.

Next, the ALJ assessed Coleman's RFC. She found that McCormick

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant: can occasionally climb ladders, ropes or scaffolds, stairs and ramps; can occasionally balance, stoop, kneel, crouch and crawl; can occasionally push, pull, operate hand controls and reach in all directions including overhead with the right upper extremity; must not have concentrated exposure to extreme cold and excessive vibration; and is limited to simple, repetitive and routine tasks with no fast production rate, such as on an assembly line.

(Tr. 32.) As part of this assessment, the ALJ found that McCormick's statements about the intensity, persistence, and limiting effect of his symptoms were not entirely credible. Two of McCormick's treating physicians also submitted opinions about both his physical and mental health function, but the ALJ gave these opinions little weight. Instead, the ALJ gave significant weight to a non-examining physician's opinion that McCormick's anxiety and depression only mildly limit his social function.

At Step Four, the ALJ relied on vocational expert ("VE") testimony and found that McCormick cannot perform any past relevant work. At Step Five, the ALJ analyzed whether McCormick can successfully adjust to other work. She noted if McCormick had the RFC to perform the full range of light work (if her RFC matched perfectly the light work Grid rule), the Grids would direct a finding of not disabled. But additional limitations impede McCormick's ability to perform all or substantially all of the light work requirements. Thus, the ALJ relied on VE testimony to determine the extent to which these limitations erode McCormick's occupational base to perform unskilled light

work.  The VE testified that McCormick is able to perform work as a collator operator and merchandise marker, even after considering all of the limitations in McCormick's RFC.  The ALJ then found that these jobs exist in significant numbers in the national economy and concluded McCormick is not disabled.

## IV.    Standard of Review

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g).  Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (alteration in original) (*quoting Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)).  The Court must also consider any evidence that fairly detracts from the Commissioner's decision.  *Id.*  "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992).

## V.    Discussion

McCormick claims the ALJ's RFC finding is not supported by substantial evidence.  First, he challenges the ALJ's credibility finding regarding his statements about the intensity, persistence, and limiting effect of his symptoms.  Second, he argues "[t]he Decision does not accurately summarize all of the records and evidence and seems

to pick and choose to discuss only the evidence that supports the conclusions and does not address the evidence that detracts from the decision." (#15 at 3.) The Court will first consider the credibility argument because it affects the weight the ALJ gives to McCormick's testimony and because the ALJ must evaluate credibility before determining RFC. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007).

A. **Credibility**

"Credibility determinations are the province of the ALJ, and as long as 'good reasons and substantial evidence' support the ALJ's evaluation of credibility, [this Court] will defer to her decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (*quoting Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). "An ALJ may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Id.* (*quoting Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)).

"When evaluating the claimant's subjective complaints, the ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the" factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Id.* The *Polaski* factors are (1) "the claimant's daily activities"; (2) "the duration, frequency and intensity of the pain"; (3) "precipitating and aggravating factors"; (4) "dosage, effectiveness and side effects of medication"; and (5) "functional restrictions." *Polaski*, 739 F.2d at 1322. The ALJ need not discuss each factor separately; rather, this Court will review the record as a whole to confirm the ALJ did not disregard relevant evidence. *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011).

McCormick argues the ALJ's credibility finding "makes only conclusory statements without explanation" and "fails to discuss and consider the *Polaski* factors[.]" (#15 at 4.) This Court disagrees.

The ALJ discounted many of McCormick's subjective complaints of pain because they were inconsistent with the objective medical evidence in the record. For example, McCormick testified that his left knee still "gives [him] a lot of trouble" (Tr. 51) and that he can stand "for like 30 minutes maybe" before he needs to sit down (Tr. 53). But the medical records cast doubt on these allegations. One month after having surgery on his left knee, McCormick's doctor noted "[h]e has been doing physical therapy on his [left] knee and feels like his knee is doing well." (Tr. 324.) At a follow-up appointment about three weeks later, McCormick's doctor wrote "[h]is left knee looks excellent" (Tr. 322) and "[h]is left knee is doing well" (Tr. 323).

Later, McCormick had surgery on his right knee. He had three more follow-up appointments for his right knee, and he never mentioned left knee pain during any of these appointments. (Tr. 314, 315, 317.) In fact, during one of these appointments, the doctor described McCormick's extensor mechanics as "quite good" and noted he "is doing well as it relates to his function." (Tr. 314.) Around the same time, McCormick was treated for cold symptoms, and the medical records show he had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain[.]" (Tr. 346.) Finally, several other medical records—over nearly two years—show that McCormick "ambulates well" (Tr. 381, 387, 622, 630, 738, 743, 748, 753, 758, 763, 767, 772, 778, 784, 793, 799, 804, 810, 814, 843, 848, 860) and has a "normal gate" (Tr. 278, 282, 285,

563, 705, 709, 713, 718, 722) after having surgery on his left knee. Also, McCormick

had not seen his knee doctor for more than a year at the time of the hearing. (Tr. 52.)

Thus, "good reasons and substantial evidence" support the ALJ's finding that

McCormick "has alleged significant knee pain since the treatment for this arthritis, but

has been noted to be ambulatory without an assistive device as of September 2014." (Tr.

33–34.)

McCormick also testified that he has pain in his upper back and around his

shoulder blades. (Tr. 54–55, 61–62.) He explained he can sit for only about thirty

minutes before his back bothers him (Tr. 54), and he has back spasms every other day

(Tr. 61–62). Again, the objective medical evidence casts doubt on the severity of

McCormick's pain. An x-ray of McCormick's "acromioclavicular joint showed mild peri

and osteoarthritis but no dislocation or fracture." (Tr. 813.) The x-ray showed only

"[m]ild degenerative changes . . . at the right acromioclavicular joint" (Tr. 825) and

"normal appearing AP and lateral lumbar spinal alignment" (Tr. 826). The ALJ

explained "[w]hile the claimant has complained of shoulder and upper back pain around

the shoulder blades, the imaging reflects only *mild* degenerative changes in the

acromioclavicular joint, but *no fracture or dislocation* from November 2013 forward[.]"

(Tr. 34) (emphases added). That finding is supported by substantial evidence in the

record.

Back in March 2014, McCormick had an MRI scan of the cervical spine. It

showed "multi-level discogenic disease and partial herniation at C6-C7 level on right

side" (Tr. 797, 823) but "[n]o significant central spinal canal stenosis" (Tr. 823.) There

were "[s]mall C4-C5 and C5-6 central disc protrusions [that] do not cause cord deformity or central spinal canal stenosis." (Tr. 823.) The scan also showed "[m]oderate left C2-C3 and mild left C3-C4 foraminal stenosis." (Tr. 823.) The ALJ summed up the disc-related medical evidence as follows: "[w]hile there were some indications of degenerative disc disease, the relatively mild findings do not support the severe restrictions alleged by the claimant." (Tr. 34.)

McCormick was treated for back and neck pain for a couple years, and the medical records show that he successfully treated and managed the pain. (Tr. 736, 751, 756, 765, 782, 787.) The ALJ noted "[a]s of March 2015, the claimant reported that his back and neck pain were in remission from his treatment program, and there was only mild tenderness in the spine on examination and on October 9[,] 2014, the claimant stated that he was 'pain free.'" (Tr. 34.) This is supported by the medical evidence in the record.

Finally, the ALJ concluded "[t]he evidence of record suggests a steady improvement in pain levels and overall function with the use of conservative treatment for the claimant's joint pain. The portions of the claimant's testimony which [are] inconsistent with these findings cannot be considered fully substantiated." (Tr. 34.) For the reasons explained above, that finding is supported by substantial evidence in the record.

Additionally, the ALJ was justified in discounting McCormick's complaints testimony about his symptoms because two of his statements conflict with the medical records. *See Karlix v. Barnhart*, 457 F.3d 742, 748 (8th Cir. 2006). First, McCormick testified that doctors told him he would need a knee replacement if he had any more

problems (Tr. 51), but that recommendation is not documented in any of the medical

records (Tr. 33).  Second, McCormick testified that the shoulder injections help his pain

for only two or three days (Tr. 70), but he told his doctor the injections help for two to

three months (Tr. 381).

Based on the objective medical evidence and McCormick's inconsistent sworn

testimony, this Court concludes the ALJ's credibility determination is supported by good

reasons and substantial evidence, so this Court defers to the ALJ.  *Julin*, 826 F.3d at

1086.

### B.      RFC Finding

Again, McCormick's RFC is what he can do despite his limitations, and it must be

determined on the basis of all relevant evidence, including medical records, physician's

opinions, and McCormick's description of his limitations.  20 C.F.R. § 404.1545(a).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be

supported by some medical evidence of the claimant's ability to function in the

workplace."  *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007).  But "the ALJ is not

required to rely entirely on a particular physician's opinion or choose between the

opinions [of] any of the claimant's physicians."  *Martise v. Astrue*, 641 F.3d 909, 927

(8th Cir. 2011) (alteration in original) (*quoting Schmidt v. Astrue*, 496 F.3d 833, 845 (7th

Cir. 2007)).  In fact, "there is no requirement that an RFC finding be supported by a

specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  Rather,

the ALJ must base the RFC finding on all of the relevant evidence.  *McKinney v. Apfel*,

228 F.3d 860, 863 (8th Cir. 2000).

McCormick gives four reasons for why the ALJ's RFC finding is not supported by substantial evidence: (1) the ALJ failed to incorporate in the RFC "any limitations resulting from the pancreatitis"; (2) the ALJ erred in giving little weight to Dr. Chaudhari's RFC assessment; (3) the ALJ erred in giving little weight to Dr. Liss's opinions; and (4) the ALJ erred in relying on the opinion of Dr. Sutton, a non-examining doctor.

1. **Substantial Evidence Supports the ALJ's Decision to Exclude from McCormick's RFC Limitations Resulting from Pancreatitis**

In 2013, McCormick went to the emergency room several times because of his pancreatitis flare-ups. By December 2013, his pancreatic stents were removed (Tr. 287), and he reported having no pain and no functional limitations due to pancreatitis (Tr. 716). During follow-up appointments in 2014 and 2015, McCormick reported no pain (Tr. 703, 707) and no functional limitations (Tr. 703, 707, 711) from pancreatitis. The treating gastrologist described McCormick as "overall stable" on the last follow-up appointment. (Tr. 706.)

The ALJ found that "[t]he totality of the evidence suggests that the claimant has successfully recovered from an acute flare-up of pancreatitis in early 2013 and since that time has been improving steadily. As of April 2015, he was pain-free and without any significant symptoms of pancreatitis." (Tr. 35.) She still found that pancreatitis is a severe impairment because it is subject to periodic flare-ups and because "it caused more than minimal interference with work function at the time that it occurred." (Tr. 35.) The ALJ concluded McCormick's pancreatitis "is medically well-controlled, and does not

12

prevent the claimant from performing competitive work activity at the light or sedentary exertional level." (Tr. 35.) Based on the medical records discussed above, substantial evidence on the record supports this finding.

The Court also notes McCormick failed to even mention his pancreatitis during the hearing. At one point, his lawyer asked if there was anything else they had not discussed that would affect his ability to work. (Tr. 85.) McCormick mentioned that he occasionally has diarrhea, but he said "real bad" stress causes it. (Tr. 86–87.)

McCormick argues the ALJ "did not even consider whether [the pancreatitis] was disabling for any period of time." (#15 at 6.) This misstates the ALJ's decision. Again, the ALJ found that pancreatitis was a severe impairment because "it caused more than minimal inference with work function at the time that it occurred" and because "it has recurred from time to time over more than 12 months[.]" (Tr. 35.) So the ALJ did consider how the pancreatitis affected McCormick when it was active, but she found that it is now under control and does not affect McCormick's ability to perform light or sedentary work. That finding is supported by substantial evidence on the record.

McCormick also argues "[t]he hypothetical presented to the VE failed to include any limitations for pancreatitis flares or any other limitations as a result of pancreatitis." (#15 at 5–6.) Testimony from a VE constitutes substantial evidence if the VE's testimony is based on a hypothetical question that "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). Here, the ALJ's hypothetical tracked her RFC finding, and for the reasons explained above, the ALJ's decision to exclude limitations

resulting from pancreatitis is supported by substantial evidence. Thus, the hypothetical

question "capture[d] the concrete consequences of the claimant's deficiencies," *Hunt*, 250

F.3d at 625, and was properly phrased.

### 2. Substantial Evidence Supports the ALJ's Decision to Give Little Weight to Dr. Chaudhari's RFC Assessment

The earliest medical records in the administrative transcript (#10) show that Dr.

Chaudhari was treating McCormick for back and shoulder pain in 2011. He continued

treating McCormick through 2015, even after the hearing before the ALJ. A month

before the hearing, he evaluated McCormick's capacity for physical functioning. To do

so, he checked boxes, circled answers, and answered brief fill-in-the-blank questions in a

"physical residual functional capacity questionnaire." (Tr. 831–34.) The ALJ

summarized Dr. Chaudhari's opinions as follows:

> [T]he claimant could sit for less than two of eight hours per day; stand and walk for less than two of eight hours per day; could lift ten pounds occasionally and 20 pounds rarely; could rarely move his h[e]ad in all directions; could grasp, grip and turn objections with the hands 50% of the day and manipulate with the fingers 75% of the day. The claimant could reach overhead 10% of the day and would be expected to miss four or more days of work per month.

(Tr. 35.)

The ALJ gave Dr. Chaudhari's opinions little weight because

> [t]he extreme limitations of function in sitting, standing or walking found in the [questionnaire] are not consistent with Dr. Chaudhari's observations in the narrative notes [in the medical records], which found normal ambulation, no ataxia of gait and no mention of difficulty sitting. There is no testing or observation in the record to support such extreme limitations or to support the bilateral gripping, reaching and manipulative limitations found in the opinion.

(Tr. 35–36.)

"'The opinion of a treating physician is accorded special deference under the social security regulations' and 'normally entitled to great weight.'" *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (*quoting Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010)). But a treating physician's opinion is "entitled to less weight" when they "are inconsistent or contrary to the medical evidence as a whole[.]" *Halverson v. Astrue*, 600 F.3d 922, 929–30 (8th Cir. 2010) (*quoting Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002)). Also, "assessments . . . consist[ing] of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses"—that "cite no medical evidence and provide little to no elaboration" "possess 'little evidentiary value.'" *Thomas*, 881 F.3d at 675 (*quoting Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)).

Substantial evidence supports the ALJ's decision to give little weight to Dr. Chaudhari's RFC assessment. Before addressing the merits, the Court notes that Dr. Chaudhari's assessment (Tr. 831–34) is the kind of assessment that possesses only little evidentiary value. It consists of nothing more than vague, conclusory statements— "checked boxes, circled answers, and brief fill-in-the-blank responses"—that "cite no medical evidence and provide little to no elaboration[.]" *Thomas*, 881 F.3d at 675.

Turning to the merits, Dr. Chaudhari's opinions are inconsistent with "his observations in the narrative notes[.]" (Tr. 35.) Although McCormick's struggles with musculoskeletal pain are well documented, his medical records tell the story of a patient who successfully treated and managed his pain. In June 2014, Dr. Chaudhari first noted

that McCormick "manages with medications [that] help him in controlling his pain to a great extent and keep him as functional as possible." (Tr. 787.) A month later, he "seem[ed] to be responding fairly well to current medications. Without medication pain can become very intractable and refractory[.]" (Tr. 782.) Although the pain returned in August (Tr. 776) and September (Tr. 770), McCormick reported "the last shots to his scapular, interscapular and lumbar region helped significantly. He [was] pain free and doing much better" by October 2014 (Tr. 765).

By March 2015, Dr. Chaudhari noted McCormick's pain was "responding well to medications. He has suboccipital and paracervical pain which seem to be in remission." (Tr. 751.) In June, Dr. Chaudhari was still observing that McCormick responds well to medications and noted he "remains as functional as possible without manifesting unpleasant side effects." (Tr. 736.) On July 14, 2015—the same day he completed the RFC assessment—Dr. Chaudhari noted that McCormick "responds well to current medications and remains as functional as possible without manifesting side effects." (Tr. 843.) Just a month later, Dr. Chaudhari wrote McCormick "*used* to have musculoskeletal pain over supraspinatous, infraspinatous and interscapular region, occasionally in neck and low back. He has had significant pain which could become intractable but luckily it is in remission and he has responded well to medications." (Tr. 848) (emphasis added).

As the ALJ concluded, these narrative notes contradict the sitting, walking, and standing limitations in Dr. Chaudhari's assessment. Also, no observations or testing support the bilateral gripping limitations in Dr. Chaudhari's assessment. *See, e.g.*, *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (finding the ALJ did not err in discounting a

16

treating physician's opinions of limitations because the limitations were never mentioned in the treatment records and not supported by objective testing or reasoning). In fact, Dr. Chaudhari mentioned gripping only in connection to McCormick's fracturing his hand back in 2012. (Tr. 641.) And by August 2012, McCormick had "minimal if any tenderness" related to the fractured hand. (Tr. 321.)

In September 2015, it seems something changed in McCormick's lower right extremity. Dr. Chaudhari noted that McCormick "has difficulty ambulating" and "[t]here has been change in ability to execute movements with right lower extremity." (Tr. 852.) But this later change does nothing to cure the credibility problems of Dr. Chaudhari's July 2015 assessment.

McCormick argues "[t]he RFC provides no limitations to claimant's sitting, standing or walking, despite the severe impairments." (#15 at 7.) But the basis for extreme sitting, standing, and walking limitations comes from Dr. Chaudhari's assessment and McCormick's subjective complaints. Again, substantial evidence supports the ALJ's decision to give little weight to Dr. Chaudhari's assessment. Similarly, substantial evidence supports the ALJ's decision to discount some of McCormick's subjective complaints relating to pain. This argument fails.

Many of McCormick's other arguments relating to the ALJ's decision to give little weight to Dr. Chaudhari's assessment "fall in the category of deficiencies in opinion writing." *Hensley*, 829 F.3d at 932. "[A]n arguable deficiency in opinion writing that had no practical effect on the decision . . . is not a sufficient reason to set aside the ALJ's decision." *Id.* (alterations in original) (*quoting Welsh v. Colvin*, 765 F.3d 926, 929 (8th

Cir. 2014)).  These arguable deficiencies had no practical effect because the ALJ had good reason to give little weight to Dr. Chaudhari's assessment.

### 3. Substantial Evidence Supports the ALJ's Decision to Give Little Weight to Dr. Liss's Opinions

In early December 2013, Dr. Liss began treating McCormick for anxiety, depression, and post-traumatic stress disorder.  After the second visit in December 2013, Dr. Liss saw McCormick about every three months—usually for twenty minutes—until July 2015.  (Tr. 700, 732–735, 842.)  The ALJ described McCormick's mental treatment as follows:

> The claimant's mood was described as "fair" and the mental status examinations were largely within normal parameters.  The claimant was alert and oriented throughout the treatment period and while he had a blunted affect and was somewhat restless at times, he did not have any psychotic symptoms and was neither homicidal nor suicidal on examination.  Insight and judgment were intact and the claimant's speech was organized and coherent.  There w[ere] some intermittent feelings of paranoia and some withdrawal from contact with people, but his mood was stable on medications.  [The claimant's mental status was] relative[ly] stab[le.]

(Tr. 34.)

"Despite the relative stability of the claimant's mental status, Dr. Liss estimated a GAF [Global Assessment of Functioning] score of 50, in the 'serious' range of symptoms" (Tr. 34), during his first visit with McCormick (Tr. 701).  The ALJ gave the GAF score little weight because it

> is inconsistent with the lack of inpatient treatment or extensive outpatient treatment in the file.  The claimant's medications consisted of Xanax and Zoloft as of May 25, 2015, neither of which would be indicative of the type of medication that would be prescribed for someone experiencing any significant paranoia.  Accordingly, . . . neither the pharmacy records [n]or

18

the narrative records support the level of debilitating mental symptomology suggested by a GAF of 50[.]

(Tr. 34.)

In July 2015, Dr. Liss completed a "Mental Residual Functional Capacity Questionnaire"—he checked boxes, circled answers, and answered brief fill-in-the-blank questions. (Tr. 835–39.) As the ALJ described the assessment, Dr. Liss

> found multiple areas of mental health work function that were classed as either "unable to meet competitive standards" or "no useful ability in this area," including most social functioning categories, such as the ability to get along with co-workers, supervisors and the ability to respond to routine workplace changes, the ability to understand and remember instructions, make simple work-related decisions[s] and to work around others without distraction, among others[.]

(Tr. 36.) The ALJ gave little weight to this assessment because "[t]he extreme limitations of function . . . are not consistent with Dr. Liss'[s] observations in the narrative notes . . . and are likewise inconsistent with the lack of inpatient treatment or any other significant outpatient treatment records in the file." (Tr. 36.)

Substantial evidence supports the ALJ's decision to give little weight to Dr. Liss's GAF score and RFC finding. Again, an ALJ may discount a treating physician's opinion if it is inconsistent with the record as a whole. *See Halverson*, 600 F.3d at 929–30. Here, the bulk of Dr. Liss's mental examinations were unremarkable. Generally, McCormick showed (1) full orientation, (2) appropriate thought, (3) coherent thought process, (4) good or fair judgment, and (5) good eye contact. (Tr. 700, 732, 734–35, 841–42.) Psychiatric exams performed by other physicians during the same timeframe also were generally unremarkable. (Tr. 705, 709, 713, 718, 784, 789, 793, 799, 804, 810, 845,

850.)  Dr. Liss described McCormick's panic attacks as "mild" in his narrative notes (Tr. 735), but he called them "severe" in the RFC (Tr. 838).  None of Dr. Liss's narrative notes show that McCormick had suicidal thoughts, yet she claimed he did on the RFC. (Tr. 837.)  The same with memory impairment.  (Tr. 837.)  All these things undermine Dr. Liss's opinions as expressed in the GAF score and RFC assessment.  *See, e.g.*, *Halverson*, 600 F.3d at 930.  Finally, as the ALJ explained, McCormick's conservative treatment undermined Dr. Liss's opinions.  *See Lewis v. Colvin*, 973 F. Supp. 2d 985, 1004–05 (E.D. Mo. 2013) (citing cases).

### 4. Substantial Evidence Supports the ALJ's Decision to Rely on Dr. Sutton's Opinion

In June 2014, Dr. Sutton—a non-examining doctor employed by the state—evaluated McCormick's mental impairments.  (Tr. 105–07.)  Dr. Sutton found that McCormick's mental impairments were not severe because they (1) do not limit activities of daily living; (2) mildly limit the ability to maintain social function; and (3) mildly limit the ability to maintain concentration, persistent, or pace.  (Tr. 106.)

The ALJ disagreed with Dr. Sutton and found that McCormick has (1) mild restrictions in activities of daily living and (2) moderate difficulties with concentration, persistence, or pace.  (Tr. 31.)  As such, she found that depression and anxiety are severe mental impairments.  (Tr. 35.)  The ALJ did agree with Dr. Sutton's opinion that McCormick has only mild difficulties in social functioning.  (Tr. 31.)  She gave significant weight to that opinion because it was "consistent with the overall mental health record[.]"  (Tr. 35.)

McCormick makes two arguments related to Dr. Sutton's opinions. First, he seems to argue Dr. Sutton's opinions cannot support the ALJ's conclusion because Dr. Sutton found the mental impairments not severe while the ALJ found them severe. This fails because the ALJ gave significant weight only to Dr. Sutton's opinion that McCormick has mild limitations in social functioning. (Tr. 35.) And she did so because that opinion is consistent with the "overall mental health record," including Dr. Liss's narrative notes.

Second, McCormick argues Dr. Sutton's opinion is "[t]he only medical evidence upon which the decision purportedly relies," and opinions of non-examining doctors generally do not amount to substantial evidence. Thus, the argument goes, the RFC is not supported by substantial evidence. This argument fails for two reasons. One, the ALJ relied on more than Dr. Sutton's opinion; she also relied on narrative notes from several other mental health exams, including those performed by Dr. Liss. Two, "[h]aving determined that [Dr. Liss's GAF score and RFC assessment] were inconsistent with substantial evidence in the record, the ALJ was clearly authorized to consider the opinions of other physicians," including that of a non-examining physician. *Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006).

In sum, the ALJ properly relied on Dr. Sutton's opinion relating to McCormick's limitations in social functioning. The RFC is supported by substantial evidence, including some medical evidence.

## VI.     Conclusion

The medical records make clear McCormick has both mental and physical ailments. But Congress set the disability bar high, and it is not this Court's role to second guess that policy decision. Relatedly, this Court applies a deferential standard of review and can only reverse the ALJ if her decision is not supported by substantial evidence. This Court finds the ALJ's decision is supported by substantial evidence on the record and affirms the decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is affirmed.


So ordered this __19th__ day of March 2018.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE